The NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY, Mason Street Funds, Inc., and Northwestern Mutual Series Fund, Inc. Plaintiffs

v.

BANC OF AMERICA SECURITIES LLC, First Union Securities, Inc., and Goldman, Sachs & Co. Defendants.

No. 02 CIV. 3788(JGK).

United States District Court, S.D. New York.

March 31, 2003.

**392**

David Parker, Kleinberg, Kaplan, Wolff & Cohen, PC, New York City, Lawrence T. Hofmann, Jeff I. Ross, Zelle, Hofmann, Boelbel & Gette, LLP, Minneapolis, MN, Ralph A. Weber, Kurt D. Dykstra, Reinhart, Boerner, Van Deuren, Milwaukee, WI, for Northwestern Mut. Life Ins. Co., Mason Street Funds, Inc., Northwestern Mut. Series Fund, Inc.

Warren H. Colodner, Kirkpatrick & Lockhart, LLP, David B. Chenkin, Zeichner, Ellman & Krause, LLP, New York City, Kevin J. Lyons, James E. Braza, Susan G. Schellinger, Davis & Kuelthau, Milwaukee, WI, George C. Covington, Kennedy, Covington, Lobdell & Hickman, Charlotte, NC, Robert Y. Sperling, Katten, Muchin, Zavis and Rosenman, Chicago, IL, for Bank of America Securities, LLC.

Gerardi H. Gonzalez, Gonzalez, Saggio & Harlan, Milwaukee, WI, Francis C. Clark, Wachovia Corp., Milwaukee, WI, for First Union Securities, Inc.

Robert Buschman, Winston & Strawn, Steven M. Haber, Katten Muchin Zavis Rosenman, New York City, Dean P. Laing, William A. Wiseman, O'Neil, Cannon & Hollman, Milwaukee, WI, for Goldman Sachs & Co.

### OPINION AND ORDER

KOELTL, District Judge.

This is a diversity action brought by The Northwestern Mutual Life Insurance Company ("Northwestern Life"), Mason Street Funds, Inc. ("Mason Street") and Northwestern Mutual Series Fund, Inc. ("Northwestern Mutual") (collectively "the plaintiffs") against Banc of America Securities LLC ("Banc of America"), First Union Securities, Inc. ("First Union") and Goldman, Sachs & Co. ("Goldman Sachs") (collectively "the defendants") and arises out of a Rule 144A private offering of asset backed securities. The securities were backed by consumer installment contracts entered into by The Heilig–Meyers Furniture Company ("Heilig–Meyers"), a speciality retailer of home furnishings that made substantial revenues by selling furniture through fixed-term, fixed payment installment sales contracts. After Heilig–Meyers declared Bankruptcy, the plaintiffs filed the present lawsuit, alleging Wisconsin common law and statutory claims arising out of the allegedly false and misleading statements and omissions made in Offering Memoranda and other documents that were used to promote, market and sell the securities in the private offering. The plaintiffs raise four

Wisconsin common law cause of action against all of the defendants: a claim for fraud (Count 1), negligent misrepresentation (Count 2), strict responsibility (Count 3), and negligence (Count 4). In addition, the plaintiffs raise two statutory claims against Banc of America, a claim under the Wisconsin Consumer Protection Act, Wis. Stat. § 100.18 (Count 5) and a claim under the Wisconsin Blue Sky Act § 551.59 (Count 6).

This case was originally filed in the United States District Court for the Eastern District of Wisconsin, and transferred to the Southern District of New York pursuant to 28 U.S.C. § 1404(a).[1] The defendants have now moved to dismiss all of the claims pursuant to Fed.R.Civ.P. 9(b) and 12(b)(6).[2]

## I.

On a motion to dismiss, the allegations in the Complaint are accepted as true. *See Grandon v. Merrill Lynch & Co.,* 147 F.3d 184, 188 (2d Cir.1998). In deciding a motion to dismiss, all reasonable inferences are drawn in the plaintiff's favor. *See Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995); *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir.1985). Therefore, the defendants' motion to dismiss should only

be granted if it appears that the plaintiffs can prove no set of facts in support of their claims that would entitle them to relief. *See Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 122 S.Ct. 992, 998, 152 L.Ed.2d 1 (2002); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Grandon,* 147 F.3d at 188; *Goldman,* 754 F.2d at 1065.

In deciding the motion, the Court may consider documents that are referenced in the Complaint, documents that the plaintiffs relied on in bringing suit and that are either in the plaintiffs' possession or the plaintiffs knew of when bringing suit, or matters of which judicial notice may be taken. *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002); *see also Brass v. Am. Film Techs., Inc.,* 987 F.2d 142, 150 (2d Cir.1993); *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47–48 (2d Cir.1991); *VTech Holdings Ltd. v. Lucent Techs., Inc.,* 172 F.Supp.2d 435, 437 (S.D.N.Y.2001). "[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a document upon which it relies and which is integral to the complaint, the court may nonetheless take the document into consideration in deciding the defendant[s'] motion to dismiss, without converting the proceeding to one for summary judgment." *Int'l Audiotext Network, Inc. v. AT & T Co.,* 62 F.3d 69, 72 (2d Cir.1995) (internal citation and quotation marks omitted); *see Yucyco, Ltd. v. Republic of Slovenia,* 984 F.Supp. 209, 215 (S.D.N.Y.1997).[3]

---

**1.** A related case, *AIG Global Securities et al. v. Banc of America,* No. 01 Civ. 11448, is also before this Court and raises claims arising out the same Rule 144A private offerings against Banc of America and First Union, and is based on violations of the federal securities law. Today the Court has also issued an Opinion and Order resolving the defendants' motions to dismiss in that case.

**2.** Although each of the defendants filed separate motions to dismiss, the arguments raised

in the papers with respect to all of the claims, with the exception of the two statutory causes of actions, are quite similar. For the purposes of this Opinion and Order, where it is appropriate, and unless otherwise noted, the arguments raised by one defendant are treated as equally applicable to all three defendants in this case.

**3.** The plaintiffs rely on several supplemental affidavits in their responsive papers, and these affidavits, because they are not specifi-

Accordingly, the following facts are alleged in the Complaint and for the purposes of this motion are accepted as true.

In 1998 Heilig–Meyers was the largest publicly held retailer of home furnishings in the United States, operating 1243 stores in 38 states, Washington D.C. and Puerto Rico. (Compl.¶ 9.) Two years later, in August 2000, Heilig–Meyers filed a Chapter 11 Bankruptcy petition in the United States Bankruptcy Court for the Eastern District of Virginia. (*Id.*)

The majority of Heilig–Meyers merchandise was sold through installment sales contracts (the "Contracts"). (Compl.¶ 10.) Each of these contracts required the customer to pay monthly installments of principal and interest due, and were secured by the merchandise purchased, giving Heilig–Meyers the right to repossess the furniture in the event of a default. (*Id.*)

On February 26, 1997, Heilig–Meyers, along with the MacSaver Funding Corporation ("MacSaver") and First Union National Bank, an affiliate of First Union, entered into the Master Pooling and Servicing Agreement, which established the Heilig–Meyers Master Trust (the "Trust"). (Compl.¶ 12.) The Trust was created to hold the Contracts, the monies due under those Contracts, the security interests in the goods sold pursuant to the Contracts, and certain reserve funds. (Compl ¶ 11.) Under the Master Pooling and Servicing Agreement, Heilig–Meyers was to act as the Servicer of the Contracts, a role that required it, among other things, to maintain accurate records of the Contracts and related payment activity, to collect all principal and interest due on the Contracts, to investigate payment delinquencies, to maximize recoveries on delinquent and defaulted Contracts, and to remit all proceeds to

the Trust. (Compl.¶ 13.) MacSaver was the Transferor of the Contracts, meaning that it purchased the Contracts from Heilig–Meyers and transferred them to the Trust. (Compl.¶ 14.) First Union Bank served as the Trust's Trustee, a role that required it to preserve Trust assets, make distributions to certificate holders, monitor the performance of Heilig–Meyers, the Servicer, ensure a smooth transition to a new servicer, and serve as a replacement servicer, if necessary. (Compl.¶ 15.)

During 1997 and 1998, the Trust issued a series of asset-backed securities (the "Certificates"), and each Certificate represented an undivided interest in the Trust and the right to receive a portion of the collections on the Contracts. (Compl.¶ 18.) On February 28, 1997 the Trust issued the 1997–1 Certificates, in the principal amount of $ 592,000,000, and a substantial amount of these securities were purchased by Banc of America and First Union, who held those Certificates until at least February 28, 1998. (Compl.¶ 19.)

In February 1998, the Trust issued the 1998–1 Certificates. (Compl.¶ 20.) These Certificates were divided into four classes of interests, namely (1) Class A 6.125% Asset–Backed Certificates ("1998–1 Class A Certificates"), in the aggregate principal amount of $ 307,000,000; (2) Class B 6.35% Asset–Backed Certificates ("1998–1 Class B Certificates"), in the aggregate principal amount of $ 61,000,000; (3) the Collateral Indebtedness Interest (the "Class C interests") in the aggregate principal amount of $ 32,000,000; and (4) the Class D Asset–Backed Certificates in the principal amount of $ 35,500,000. (Compl.¶ 20.) The defendants purchased all of the 1998–1 Class A and B Certificates from the Trust and resold some or all of them through a February 20, 1998 Offering (the

cally referred to in the Complaint or relied on by the plaintiffs in drafting the Complaint, are

not considered for purposes of resolving this motion to dismiss.

"1998–1 Offering"). (Compl.¶ 21.) The defendants served as underwriters for the 1998–1 Offering, controlling the structure and pricing of the Certificates, drafting the Preliminary and Final Offering Memoranda, and making oral representations. (Compl.¶ 22.) The plaintiffs, including Northwestern Mutual, Northwestern Life, and Mason Street, purchased a total amount of Class A and Class B Certificates with a face value of $88,000,000, from the various defendants over a period from February 20, 1998 to January 26, 2000. (Compl.¶ 25.) The Class C interests were not sold to the plaintiffs, but to Bayerische Hypo-und Vereinsbank AG, New York Branch. The Class D interests were retained by the Transferor. (Compl.¶¶ 23–24.)

The plaintiffs allege that the defendants in the course of selling the 1998–1 Certificates made various misrepresentations and omissions, and these alleged misrepresentations and omissions form the basis of the claims in the Complaint. The alleged misrepresentations involve several broad categories of facts and circumstances and relate to the practices of Heilig–Meyers, the nature of the securities being sold in the two offerings, and the duties to be performed by the defendants in the case of a Heilig–Meyers bankruptcy.

First, the plaintiffs allege that the defendants failed to disclose alleged self-dealing by Banc of America and First Union. Specifically, they allege that neither Banc of America nor First Union disclosed the fact that they held all or substantially all of the 1997–1 Certificates, that none of the defendants, including Goldman Sachs, disclosed the fact that the proceeds from the 1998–1 Offering would be used to pay back all, rather than merely a portion, of the 1997–1 Certificates, and that the Offering Memoranda created the false impression that the proceeds from the 1998–1 Offering would be used by the Trust to purchase additional Contracts, and thereby provide additional financing for Heilig–Meyers. (See Compl. ¶¶ 31–37.)

Second, the plaintiffs allege that the defendants misrepresented the amounts due under the Contracts. Specifically, the plaintiffs allege that the defendants falsely represented that the Certificates were low-risk investments, that the defendants knew or were reckless in not knowing that the aggregate total balances due under the Credit Agreements, as reported in the Offering Memoranda, were overstated by approximately $ 40 million, and that because the Contract balances served as the collateral securing the Certificates, the effect of overstating the balances due under the Contracts amounted to a failure to disclose that the Certificates were under-collateralized. (Compl.¶¶ 38–44.)

Third, the plaintiffs allege that the defendants' representations that the loss and delinquency rates for collections under the Contracts were comparable to those of other major retailers were misleading, because the defendants failed to disclose that Heilig–Meyers' rates were calculated by using unorthodox accounting measures, including recency accounting, that resulted in lower loss and delinquency figures. (Compl.¶¶ 45–58.)

Fourth, the plaintiffs allege that the defendants failed to disclose the fact that Heilig–Meyers routinely extended additional credit to delinquent customers by rewriting Contract terms if the customer was a repeat purchaser and bought new furniture, thereby altering and lowering loss and delinquency rates, and the fact that such practices deviated from conventional underwriting, collection and accounting practices. (Compl.¶¶ 59–66.)

Fifth, the plaintiffs allege that the defendants misrepresented the ways in which Heilig–Meyers conducted its servicing of the Contracts, by failing to inform the

plaintiffs that Heilig–Meyers stores often failed to obtain critical information from obligors, including names, telephone numbers, addresses, and other information that significantly impacted on a obligor's creditworthiness and ability to repay. (Compl.¶¶ 67–76.)

Sixth, the defendants similarly misrepresented the nature of the collections system in place for receiving payments under the Contracts, by indicating that a centralized system of collections was in place, when in fact, collections were decentralized and payments were handled by individual store managers spread throughout 500 Heilig–Meyers stores. (Compl.¶¶ 77–79.)

Seventh, the defendants allegedly failed to disclose the potential that certain circumstances would permit holders of the Class C Interests to have priority in receiving payments over the Class A and Class B holders. (Compl.¶¶ 80–94.)

Finally, the plaintiffs allege that the defendants misrepresented that First Union Bank was ready and able to serve as a back-up servicer should Heilig–Meyers cease to perform that role, despite the fact that First Union Bank had inadequate plans and capabilities to serve as a back-up servicer and although there were other circumstances that would make the transition to a new servicer more difficult. (Compl.¶¶ 95–103.)

## II.

■ As an initial matter, because jurisdiction in this case is based on diversity of citizenship, and the case has been transferred from the Eastern District of Wisconsin, it is necessary to determine which jurisdiction's laws should be applied in deciding the defendants' motion to dismiss.

When state law claims are transferred from one federal district to another district, pursuant to § 1404(a), the transferee district is required to apply the state law that would have been applied in the transferor district had there been no venue transfer. *Van Dusen v. Barrack*, 376 U.S. 612, 639–40, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964); *Ferens v. John Deere Co.*, 494 U.S. 516, 531, 110 S.Ct. 1274, 108 L.Ed.2d 443 (1990) (holding that *Van Dusen* applies regardless of which party moves to transfer pursuant to 28 U.S.C. § 1404(a)). In this case, the federal court in Wisconsin would have applied Wisconsin substantive law to the claims in this case, because it is a diversity case, the only claims are brought under Wisconsin state law, and the parties do not suggest that any Wisconsin choice of law analysis would dictate a different law to be applied. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 79–80, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Guaranty Trust Co. v. York*, 326 U.S. 99, 109, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945); *Cantor Fitzgerald Inc. v. Lutnick*, 313 F.3d 704, 710 (2d Cir.2002). Consequently, this Court is also obligated to apply Wisconsin law to the claims in this case. *See Van Dusen*, 376 U.S. at 639, 84 S.Ct. 805.

■ However, the defendants have also moved to dismiss several of the state law claims on the basis of federal procedural law, specifically Fed.R.Civ.P. 9(b), which requires that claims of fraud be pleaded with particularity. With respect to the dismissal of the plaintiffs' claims made on the basis of Rule 9(b), this Court is not obligated to apply the law of the transferor court, which would have been the law the Seventh Circuit; because Rule 9(b) is a rule promulgated pursuant to a federal statute, this Court is required to follow the precedent of the Court of Appeals for the Second Circuit with respect to the interpretation and application of Rule 9(b). *Van Dusen* was based upon *Erie* and its progeny which required that a federal court ruling on questions of state law apply the same state law as the state court in the jurisdiction in which the federal court

lawsuit was filed. The same rationale does not apply to the application of federal law which is a national body of law. *See Menowitz v. Brown,* 991 F.2d 36, 40 (2d Cir. 1993) (per curiam) ("[T]he rule of *Van Dusen* does not apply ... where a case is transferred under § 1407...,[because] [f]ederal courts comprise a single system applying a single body of law, and no litigant has a right to have the interpretation of one federal court rather than that of another determine his case.") (quotations omitted); *In re Korean Air Lines Disaster,* 829 F.2d 1171, 1174 (D.C.Cir. 1987)(Ruth B. Ginsburg, J.) ("the transferee court [under § 1407] should be free to decide a federal claim in the manner it views as correct without deferring to the interpretation of the transferor circuit") (quotations omitted), *aff'd on other grounds sub nom Chan v. Korean Air Lines, Ltd.,* 490 U.S. 122, 109 S.Ct. 1676, 104 L.Ed.2d 113 (1989); *Garrel v. NYLC Health Plans, Inc.,* No. 98 Civ. 9077, 1999 WL 459925, at *8 (S.D.N.Y.1999)(transferee court under § 1404(a) is not bound by *Van Dusen* on issues of federal law); *cf. McMasters v. United States,* 260 F.3d 814, 819–820 (7th Cir.2001) (affirming district court's application of transferee circuit law rather than law of the transferor circuit, in case transferred under § 1404(a) which involved interpretation of Fed.R.Civ.P. 4).

## III.

The defendants move to dismiss the plaintiffs' first cause of action for common law fraud for failure to satisfy the pleading requirements of Fed.R.Civ.P. 9(b). The defendants argue that with respect to the eight classes of alleged misrepresentations identified in the Complaint, the plaintiffs have failed to identify any of the particular statements made, when they were made, by whom they were made, and why they were fraudulent, and therefore have failed to allege fraud with sufficient particularity.

Fed.R.Civ.P. 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed R. Civ. P. 9(b); *see Four Finger Art Factory v. Dinicola,* No. 99 Civ. 1259, 2001 WL 21248, at *5 (S.D.N.Y. Jan.9, 2001). To meet the requirements of Rule 9(b), a complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993).

The classes of misrepresentations identified by the plaintiffs in this case are virtually identical to the classes of misrepresentations identified by the plaintiffs in the related case also pending before this Court, *AIG Global Sec. et al. v. Banc of America,* No. 01 Civ. 11448. The Court has today issued an Opinion and Order in that case (the *"AIG* Op."), granting the defendants' motion to dismiss federal securities law claims for, among other things, failing to satisfy the pleading requirements of Rule 9(b). The Complaint in the present case suffers from many of the same deficiencies as the Complaint in *AIG Global Sec.* and the analysis of the Complaint in that case is equally applicable to the misrepresentations now being alleged by Northwestern Mutual and the other plaintiffs in this case.

■ With respect to the plaintiffs' first set of allegations, that the defendants failed to disclose the fact that the 1997–1 Certificates were going to be paid back in full from the proceeds that the defendants received from the 1998–1 Offering, the plaintiffs have failed to identify any statement, either oral or written, or specifically indicate what statement, if any, in the Offering Memoranda is misleading. The plaintiffs plead in the most general terms

that plaintiffs were engaged in self-dealing by paying down their investments in the 1997–1 Certificates, without providing any factual basis to conclude that any specific statements were false or misleading. The disclosures made in the Offering Memoranda regarding the defendants' intentions to pay off the 1997–1 Certificates were sufficient to place the plaintiff on notice that an unspecified portion of the 1998–1 Offering was in fact being used to pay off a prior offering. *See* AIG Op. at 31–32.

With respect to the second set of alleged misrepresentations relating to the balances due under the Contracts, these allegations also fail to satisfy Rule 9(b). There is no factual basis in the plaintiffs' allegations from which to determine that any statements in the Offering Memoranda were false or misleading. The Complaint refers to oral conversations with Northwestern Mutual, but fails to give any of the details of such conversations including the speaker, the specific statements, and where and when the statements were made. (Compl. ¶ 39.) Even as to the statements of Contract balances in the Offering Memoranda, the Complaint identifies the contract balances but fails to explain how they were false. The Complaint refers to servicing reports received in early 2001 that indicated that there were at least approximately $40 million less in outstanding Contract balances than represented in the Offering Memoranda. (Compl. ¶ 40.) This statement, however, says little about the accuracy of the Contract balances as of December 31, 1997 reported in the Offering Memoranda. (*See* 1998–1 Offering Memorandum attached as Exh. 4 to Decl. of Areyh S. Portnoy dated April 1, 2002 at 37.) It would surely be difficult to deduce from the financial condition of a company in bankruptcy what the state of its Contract balances were over three years before. In any event, there is no statement in the Complaint as to the degree to which the Contract balances were allegedly over-

stated. *See also AIG* Op. at 29 ("Those statements ... fail to explain how the balances were overstated.") Without such specific information, the plaintiffs have failed to explain how the statements in the Offering Memoranda were fraudulent.

The plaintiffs third and fourth sets of allegations dealing with the loss and delinquency rates reported under the Contracts also fail to satisfy Rule 9(b). The Complaint refers to telephone conversations with Northwestern Mutual shortly before February 20, 1998 in which the defendants Banc of America and First Union allegedly state that the delinquency rates on the Contracts were "comparable" to the delinquency rates of other pools of retail consumer receivables. (Compl. ¶ 48.) The Complaint fails, however, to specify who allegedly made these statements, although the plaintiff Northwestern Mutual should plainly have this information. There is no indication of the amount by which these figures were under or overstated, *AIG* Op. at 26, and no indication what the relationship between the allegedly unorthodox accounting practices and the loss and delinquency figures were. *Id.* at 26. Rather than indicating how the figures in the Offering Memoranda were allegedly misleading, the Complaint relies on an alleged comparison of contract and recency accounting for the period September 2000 to October 2001, without any explanation of how, if at all, this could be extrapolated to the delinquency rates reported in the Offering Memoranda for a period three years earlier. Given the precise disclosures made in the Offering Memoranda, that indicated the use of flexible-credit terms and recency accounting by Heilig–Meyers, the plaintiffs have failed to plead specifically how the statements in the Offering Memoranda were false or misleading. *Id.* at 26–27. In addition, to the extent that the plaintiffs have alleged that

the loss and delinquency figures disclosed were misleading because they were not comparable to those of other retailers, the plaintiffs have failed to identify the comparisons about which they are complaining and have failed to specify how they were misleading. *Id.* at 27–28.

The plaintiffs fifth and sixth sets of allegations relating to the servicing of the Contracts and the extent to which the defendants misrepresented the collection systems and servicing policies for the Contracts also do not satisfy Rule 9(b). The plaintiffs have not cited to any specific statements made in the Offering Memoranda or to other documents that represent the nature of Heilig–Meyers practices, but they simply speak in broad and general terms about what the plaintiffs believe the Offering Memoranda stated. (*See, e.g.,* Compl. ¶¶ 68, 69, 78.) The plaintiffs also refer to telephone conversations but fail to say who participated in the conversations, when they occurred, or what specifically was said. (*See, e.g.,* Compl. ¶¶ 68, 69, 78.) Moreover, the specific representations would have to be measured against the actual disclosures before it could be determined that the alleged statements sufficiently alleged material misrepresentations or omissions. The Offering Memoranda, did indicate, among other things, that Heilig–Meyers conducted collections and extended credit through individual credit managers and that those collections were made at individual stores. *AIG* Op. at 20–22.

■ In the seventh set of allegations, the defendants are alleged to have failed to disclose the potential that under certain circumstances Class C interest holders would have priority in receiving payments over the Class A and Class B holders. However, the fact remains that in the Offering Memoranda the defendants disclosed the fact that Class A and Class B certificate holders would retain priority over Class C holders, as the plaintiffs themselves acknowledge. (*See* Compl. ¶ 84.) The plaintiffs allege fraud, based on the fact that certain holders of the Class C interests, in litigation now pending, have claimed that they have priority over the Class A and Class B interests. (Compl. ¶¶ 89–92.) However, the fact that third-parties are now proceeding to dispute the priority of the Class A and B interests does not indicate that the representations were false. The defendants made disclosures fully consistent with the position of the plaintiffs, and there is no allegation that the defendants themselves dispute the priority of the Class A and the Class B certificates. These allegations also suffer from the pervasive problem in the Complaint of referring to telephone conversations without specifying the participants and the specific content of the calls, although this is information that the plaintiffs should have. (Compl. ¶¶ 85, 92.)

■ Finally, the plaintiffs have alleged that the defendants misrepresented the willingness and ability of First Union Bank to serve as a back-up servicer for the Contracts should Heilig–Meyers fail to serve adequately in that capacity. With respect to this set of allegations, in the Complaint the plaintiffs have not attempted to identify any statement where the defendants represented that First Union Bank would be a back-up servicer. The Complaint states that "[t]he Offering Memorandum explicitly stated … First Union Bank would function as Servicer until a replacement servicer could be found," Compl. ¶ 95, but the Complaint never identifies the "explicit" statement to which this paragraph refers, and the remaining paragraphs in this section of the Complaint never identify the representations that form the basis of the allegedly fraudulent conduct. The Complaint also alleges that there was a representation

that First Union Bank was a "warm" back-up servicer, but there is no specification as to where such a representation was made. Moreover, the Offering Memoranda make clear that First Union Bank would not immediately take over as back-up servicer for the Contracts. *See AIG* Op. at 23–24. At most, all that the plaintiffs have alleged is that First Union Bank failed to live up to certain obligations that it allegedly agreed to perform; however, without additional facts, this is not an adequate statement of a misrepresentation of present fact, and does not constitute fraud. *See AIG* Op. at 24–25.

Thus, none of the statements identified by the defendants, for the reasons explained earlier, satisfy the requirements of Rule 9(b), and therefore the plaintiffs' first cause of action, for common law fraud, is dismissed, without prejudice to repleading.

### IV.

██ The defendants also seek to dismiss the plaintiffs' claim for negligent misrepresentation. To state a claim for common law negligent misrepresentation under Wisconsin Law, the plaintiff must allege that the "defendant misrepresented a fact to the plaintiff or to a third person with the intent that it would be communicated to or influence the plaintiff." *Friends of Kenwood v. Green,* 239 Wis.2d 78, 619 N.W.2d 271, 275 (Wis.App.2000); *Rendler v. Markos,* 154 Wis.2d 420, 453 N.W.2d 202, 205 (1990).

██ Although Wisconsin state law provides that claims of negligent misrepresentation must satisfy Wis. Stat. § 803.03(2), which requires that fraud be pleaded with particularity, *see Friends of Kenwood,* 619 N.W.2d at 276, the Wisconsin provision does not govern the disposition of the defendant's motion to dismiss the claim for negligent misrepresentation. The Wisconsin statute is a rule of procedure, and because the present case is a

diversity action in federal court, this Court must decide whether the federal pleading rule, Rule 9(b), would be applied to a claim for negligent misrepresentation. *Vess v. Ciba–Geigy Corp. USA,* 317 F.3d 1097, 1102–03 (9th Cir.2003); *see Stern v. Gen. Elec. Co.,* 924 F.2d 472, 476 n. 6 (2d Cir. 1991) (noting that although state's substantive law governed plaintiff's claims for fraud, Federal Rules of Civil Procedure govern degree of particularity required for such claims); *Hanna v. Plumer,* 380 U.S. 460, 473–74, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965).

A common law claim for negligent misrepresentation must satisfy the requirements of Fed.R.Civ.P. 9(b). *See Simon v. Castello,* 172 F.R.D. 103, 105 (S.D.N.Y. 1997); *State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada,* 246 F.Supp.2d 231 (S.D.N.Y.2002).

For the reasons explained above, the plaintiffs have failed to satisfy the requirements of Rule 9(b) with respect to any of the classes of statements identified in the Complaint, and consequently, their claim for negligent misrepresentation must be dismissed.

### V.

The defendants also seek to dismiss the plaintiffs' common law claim for negligence. Under Wisconsin law, the elements for a negligence claim are "1) a duty of care on the part of the [defendants]; 2) a breach of that duty; 3) a causal connection between the conduct and the injury; and 4) an actual loss or damage as a result of the injury." *Lisa's Style Shop, Inc. v. Hagen Ins. Agency, Inc.,* 181 Wis.2d 565, 511 N.W.2d 849, 852 (1994) (quotations omitted).

The plaintiffs have failed to explain in this case how their claim of negligence based on a duty of due diligence differs from their claim of negligent misrepresen-

tation, which is insufficient for the reasons stated above. The Complaint alleges negligence in the conduct of due diligence, but makes no specific allegations other than the alleged oral misrepresentations and omissions and the alleged misstatements in the Offering Memoranda. (*See* Compl. ¶ 117.) The plaintiffs fail to allege how they could have been harmed by the conduct of the investigation by the defendants other than through the alleged misstatements or omissions. For the reasons explained above, the plaintiffs have failed to allege sufficient claims for negligent misrepresentation, and therefore, a claim of negligence.

 Moreover, in order to state a claim of negligence, the plaintiffs allege the breach of some duty that the defendants owed to the plaintiffs. The plaintiffs argue that the defendants owed a duty to conduct due diligence with respect to the operations of Heilig–Meyers, but they can point to no case in which a "duty" of "due diligence" has been found to exist between underwriters and purchasers of securities. Due diligence is a defense to an underwriter's liability rather than an obligation owed to purchasers. *Cf. Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 208 n. 26, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). In this heavily regulated area of the law, there is no basis to create a new common law duty. *See Frank v. Bear Stearns & Co.*, 11 S.W.3d 380, 385–86 (Tex.App.2000). The only case cited by the plaintiffs that some duty of due diligence does in fact exist, *First Nat'l Bank v. Am. Lenders Facility, Inc.*, No. 00–269, 2001 WL 1640128 (D.Minn. Sept.25, 2001), does not specifically refer to a duty of due diligence and did not involve the application of Wisconsin state law. In addition, the cases cited by the plaintiffs creating a duty on the part of issuers and underwriters to disclose conflicts of interest were cases interpreting the federal securities laws, not claims arising under common law. Without any support for the existence of such a duty of due diligence to purchasers, the plaintiffs' negligence claim also fails as a matter of law.

## VI.

 The defendants have also moved to dismiss the plaintiffs' common law claim for strict responsibility. In order to plead a claim of strict responsibility, the plaintiffs must allege that the source of the alleged misrepresentation "appears to have such personal knowledge that it is expected that [the source] is providing infallible information." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Boeck*, 127 Wis.2d 127, 377 N.W.2d 605, 610 (1985). As the Supreme Court of Wisconsin explained,

> In strict responsibility the misrepresentation must be made on the defendant's personal knowledge or under circumstances in which he necessarily ought to have known the truth or untruth of the statement and the defendant must have an economic interest in the transaction... In this classification the speaker is supposed to possess complete knowledge of the facts or could normally be expected to know them without investigation.

*Id.* (quotations omitted). The plaintiffs have not alleged, with respect to any set of the alleged misrepresentations, that the defendants possessed complete knowledge of the facts reported in the Offering Memoranda and other materials, or that the defendants could have been expected to know such facts without investigation. Indeed, the Offering Memoranda made it clear that the defendants were not the source of the information and contained numerous disclaimers. In addition, there is no basis from the facts alleged in the Complaint to suggest that the defendants created the expectation that they possessed infalliable information. The ab-

sence of such allegations in the Complaint requires that the plaintiffs' claim for strict representation be dismissed.

## VII.

■■■ The defendant Banc of America seeks to dismiss the plaintiffs' statutory claims under the Wisconsin Consumer Protection Act and the Wisconsin Blue Sky Act and argues that these claims are barred by the relevant statute of limitations.

The Wisconsin Consumer Protection Act provides that "[n]o action may be commenced under this section more than 3 years after the occurrence of the unlawful act or practice which is the subject of the action." Wis. Stat. § 100.18(11)(b)3. This three year period has been interpreted to be a statute of repose, whereby "a cause of action must be commenced within a specified amount of time after the defendant's action which allegedly led to injury, *regardless of whether the plaintiff has discovered the injury or wrongdoing.*" *Kain v. Bluemound East Indus. Park, Inc.*, 248 Wis.2d 172, 635 N.W.2d 640, 645 (Wisc.App.2001) (quotations omitted) (emphasis in original).

In *Kain* the Wisconsin Court of Appeals dismissed the plaintiff's claim for false advertising, in connection with the purchase of real estate, brought pursuant to Wisc. Stat. 100.18(1). In so doing, the Court found that the relevant date in determining whether the plaintiff's claim was barred by the three year statute of repose, was the date on which the defendant engaged in the alleged false advertising, even though that occurred before the plaintiff bought the property and before the plaintiff suffered any injury. *Id.* The unlawful act prohibited by Wisc. Stat. § 100.18, the same statute at issue here, is to

> make, publish, disseminate, circulate, or [place] before the public ... an advertisement, announcement, statement or representation ... relating to [the] purchase [or] sale ... of ... real estate, merchandise, securities, service or employment ..., which advertisement, announcement, statement or representation, contains any assertion, representation, or statement of fact which is untrue, deceptive or misleading.

In *Kain*, the Court noted that the Wisconsin legislature had determined that the Consumer Protection Act claim began to accrue "at the time of the defendant's actions," not at the time the plaintiff was injured or the date on which the plaintiff discovered the defendant's allegedly fraudulent conduct. *Id.*

In this case, the plaintiffs' Consumer Protection Act claim, is based on the same statute, Wisc. Stat. 100.18 *et seq,* that was found in *Kain* to have a three year statute of repose accruing on the date of the defendant's conduct. In Count Five, the plaintiffs base their claim under the Wisconsin Consumer Protection Act on their alleged purchase of securities from Banc of America on January 26, 2000. However, the latest date of the alleged misrepresentations and omissions that the plaintiff allege Banc of America to have engaged in is February 20, 1998, the date of the 1998–1 Offering. (*See, e.g.,* Compl. ¶¶ 21, 25, 39, 48.) The plaintiffs have not alleged any misrepresentations or omissions that may have occurred on January 26, 2000, during the course of the sale or purchase of the securities. Consequently, with respect to the alleged misrepresentations at issue in the plaintiffs' Complaint, the limitations period began to run at the time that Banc of America allegedly made the misrepresentations, not when the misrepresentations were discovered by the plaintiffs or when they purchased the January 26, 2000 block of securities. Pursuant to Wisc. Stat. § 100.18(11)(b)3, actions filed after February 20, 2001 would be barred. The Complaint was filed on December 7, 2001, and is therefore beyond the three year

limitations period, and the Consumer Protection Act claim must be dismissed as barred by the statute of repose. This dismissal, however, is without prejudice to repleading, because it cannot be found that the plaintiffs could plead no untrue, deceptive, or misleading statements that are not barred by the statute of repose.

 On the other hand, with respect to the Wisconsin Blue Sky Act claim, in Count Six, the plaintiffs' claim is not barred by the statute of limitations. The plaintiffs base their Wisconsin Blue Sky Act claim on a violation of Wisc. Stat. § 551.59, which provides in relevant part, that "Any person who offers or sells a security in violation of ... 551.41 ... is liable to the person purchasing the security from him or her." Wisc. Stat. 551.59(1)(a). Section 551.41 is the Wisconsin counterpart to Rule 10b–5. Section 551.41, makes it unlawful,

[F]or any person, in connection with the offer, sale or purchase of any security in this state, directly or indirectly:

(1) To employ any device, scheme or artifice to defraud;

(2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or

(3) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person.

The plaintiffs have alleged that the defendants violated the Wisconsin Blue Sky Act in connection with the plaintiffs' purchase of securities on January 26, 2000. (Compl.¶ 123.)

Banc of America seeks to dismiss the plaintiffs' Blue Sky Act claims as barred by the statute of limitations. The limitations period provides that "[n]o action shall be maintained under this section unless commenced before the expiration of 3 years after the act or transaction constituting the violation." Wis. Stat. § 551.59(5). In this case, because the plaintiff's claim is based on a violation of § 551.59 and § 551.41, the relevant limitations period began to accrue at the time of the "act or transaction constituting the violation." The violation occurs when the person "offers or sells" a security in violation of the anti-fraud statute. This is consistent with the other cases that have described the statute of limitations as commencing under the Wisconsin Blue Sky statute on the date the securities were purchased or sold. *See Ahmed v. Trupin*, 809 F.Supp. 1100, 1108 (S.D.N.Y.1993); *Heaney v. Associated Bank, N.A.*, No. 88 C–913, 1990 WL 446707, at *13–14 (E.D.Wis. July 11, 1990). The sale in violation of the statute allegedly took place on January 26, 2000 and the three year period would have expired on January 26, 2003. The plaintiffs filed their claim well before that period expired, and therefore their Blue Sky Act claim is not barred by the statute of limitations.

 However, even though Count Six is not barred by the statute of limitations, for the reasons explained above, the plaintiffs have failed to plead fraud with particularity. The Wisconsin Blue Sky statute allegedly violated is the state analogue to Rule 10b–5. Therefore, any alleged violation must satisfy the requirement that fraud be pleaded with particularity pursuant to Fed.R.Civ.P. 9(b). Because the alleged fraud was not pleaded with particularity, this Count must also be dismissed without prejudice to repleading.

## CONCLUSION

The remaining arguments of the parties are either moot or without merit. For the reasons explained above, the plaintiffs' common law causes of action for fraud, negligent misrepresentation, negligence,

and strict responsibility are dismissed. The Consumer Protection Act claim against Banc of America is dismissed without prejudice as untimely. Banc of America's motion to dismiss the plaintiffs' Blue Sky Act claim on statute of limitations grounds is denied. Count Six is, however, dismissed without prejudice for failure to plead fraud with particularity. Because this is the first dismissal of the plaintiffs' claims, the dismissal is without prejudice. The plaintiffs may file an Amended Complaint within thirty (30) days.

**SO ORDERED.**